IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

STANSBURY HOLDINGS CORPORATION,
ALDINE J. COFFMAN, JR.,
DENNIS R. STAAL, CPA,
RICHARD E. SELLERS, CPA, and
SELLERS & ASSOCIATES P.C.,

Defendants.

_____

**COMPLAINT**
_____

Plaintiff, the Securities and Exchange Commission ("Commission"), for its Complaint,

alleges as follows:

**SUMMARY OF THE ACTION**

1.      This case involves fraudulent misrepresentations about the financial condition of

Stansbury Holdings Corporation for periods ended June 30, 1999 through March 31, 2002.

2.      Stansbury was a public company purportedly in the business of mining the

mineral vermiculite.  Defendant Aldine J. Coffman, Jr. was Stansbury's president and chief

executive officer, and Defendant Dennis R. Staal was Stansbury's chief financial officer, during

part of the relevant period.

3.      Stansbury, Coffman and Staal defrauded investors by materially overstating

Stansbury's assets in annual and quarterly reports filed with the Commission and in a private

placement memorandum.  The asset misstatements concerned Stansbury's rights to mine two

properties, known as the "Hamilton" and "Dillon" properties, mining rights which represented

between 75% and 99% of Stansbury's reported assets in each of the relevant periods. Stansbury,

in fact, never commenced any significant mining operations on these properties.  Stansbury

fraudulently valued the Hamilton property at $15 million and the Dillon property between $3.7

to $4.2 million despite numerous events demonstrating they were worth far less, including

foreclosure actions on the properties.  Another event was Stansbury, Coffman, and Staal failed to

adjust the value of these assets even after Stansbury changed its business plan and determined

not to focus its limited resources on mining vermiculite -- the activity for which it had purchased

these mining claims.

   4.  Additionally, Stansbury, Coffman, and Staal did not disclose possible losses or

adjust the values reported for the Hamilton and Dillon properties after creditors moved to

foreclose upon them, or even after a final judgment was entered ordering the foreclosure of the

Hamilton property.

   5.  From June 2000 through May 2002, Stansbury raised almost $2 million from

investors based in part on offering materials that included its financial statements.

   6.  Stansbury's outside accounting firm was Sellers & Associates P.C.  Richard E.

Sellers was and is Sellers & Associates' president and sole shareholder.  Sellers conducted

Sellers & Associates' audit of Stansbury's financial statements for the fiscal year ended June 30,

2001, and performed quarterly reviews of Stansbury's financial statements for the quarters ended

September 30, 2001, December 31, 2001, and March 31, 2002.

   7.  Sellers & Associates and Richard E. Sellers aided and abetted Stansbury's fraud

by assisting Stansbury with making its periodic filings.  Despite Sellers' knowledge of

Stansbury's change in business plan and the foreclosure action affecting Stansbury's largest asset, Sellers and Sellers & Associates issued an audit opinion and performed quarterly reviews supporting Stansbury's reported financial statements and the inflated values derived for the properties.

8.    Stansbury, assisted by Coffman and Staal, also failed to create and maintain required books, records and accounts that accurately and fairly reflected transactions and dispositions of its assets.  In addition, Stansbury, assisted by Coffman and Staal, failed to devise and maintain a required system of internal accounting controls.

9.    Stansbury, assisted by Coffman and Staal, failed to obtain quarterly reviews of its financial statements for the quarters ended March 31, 2000, September 30, 2000, December 31, 2000, and March 31, 2001, and failed to file mandatory periodic reports with the Commission for the fiscal year ended June 30, 2002 and for the quarter ended September 30, 2002.

10.    Defendant Stansbury has engaged in, and unless restrained and enjoined by the Court will engage in, transactions, acts, practices, and courses of business that violate Sections 10(b), 13(a), and 13(b)(2) of the Securities Exchange Act of 1934 [15 U.S.C. Sections 78j(b), 78m(a), and 78m(b)(2)] and Rules 10b-5, 12b-20, 13a-1, 13a-13, and 13b2-1 thereunder [17 C.F.R. Sections 240.10b-5, 240.12b-20, 240.13a-1, 240.13a-13 and 240.13b2-1], and Section 17(a) of the Securities Act of 1933 [15 U.S.C. Section 77q(a)].

11.    Defendant Coffman has engaged in, and unless restrained and enjoined by the Court will engage in, transactions, acts, practices, and courses of business that violate Sections 10(b) and 13(b)(5) of the Exchange Act [15 U.S.C. Section 78m(b)] and Rules 10b-5 and 13b2-1 thereunder, and Section 17(a) of the Securities Act.  Further, Defendant Coffman aided and

abetted Stansbury's violations of Sections 13(a) and 13(b)(2) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder.

12.     Defendant Staal has engaged in, and unless restrained and enjoined by the Court will engage in, transactions, acts, practices, and courses of business that violate Sections 10(b) and 13(b)(5) of the Exchange Act and Rules 10b-5 and 13b2-1 thereunder, and Section 17(a) of the Securities Act.  Further, Defendant Staal aided and abetted Stansbury's violations of Sections 13(a) and 13(b)(2) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder.

13.     Defendants Sellers and Sellers & Associates aided and abetted Stansbury's violations of Sections 10(b) and 13(a) of the Exchange Act and Rules 10b-5, 12b-20, 13a-1, and 13a-13 thereunder.

## JURISDICTION AND VENUE

14.     The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. Section 77t(b)] and Sections 21(d) and (e) of the Exchange Act [15 U.S.C. Sections 78u(d) and (e)] for an order permanently restraining and enjoining each of the defendants and granting other relief.

15.     This Court has jurisdiction over this action pursuant to Sections 20 and 22(a) of the Securities Act [15 U.S.C. Sections 77t and 77v(a)] and Sections 21(e) and 27 of the Exchange Act [15 U.S.C. Sections 78u(e) and 78aa].  Venue lies in this Court pursuant to Section 27 of the Exchange Act.

16.     In connection with the transactions, acts, practices, and courses of business described in this Complaint, each of the defendants, directly and indirectly, has made use of the means or instrumentalities of interstate commerce, of the mails, and/or of the means and instruments of transportation or communication in interstate commerce.

17.     Stansbury's headquarters were located in this judicial district during the relevant time period, and Defendant Coffman resides in this judicial district.  Certain of the transactions, acts, practices and courses of business constituting the violations of law alleged herein occurred within this judicial district.

## DEFENDANTS

18.     Stansbury, a Utah corporation, purports to be engaged in the mining and processing of minerals.  Its common stock was registered with the Commission under Section 12(g) of the Exchange Act and quoted on the National Quotation Bureau's pink sheets until the registration of Stansbury's common stock was revoked on July 14, 2003.  The company filed periodic reports with the Commission on Forms 10-KSB and 10-QSB and/or 10-Q through its March 31, 2002 Form 10-Q.  Stansbury was required to file financial statements with the Securities and Exchange Commission that comply with Generally Accepted Accounting Principles (GAAP).

19.     From at least June 30, 1999 through June 30, 2000, Stansbury's stock was a "penny stock" as defined by Section 3(a)(51) of the Exchange Act and Exchange Act Rule 3a51-1.

20.     Coffman, a resident of Denver, Colorado, was elected to Stansbury's board of directors in 1998 and became Stansbury's president and chief executive officer in 1999.  He left Stansbury's employment in December 2002.

21.     Staal, a resident of Chadron, Nebraska, served as Stansbury's chief financial officer, treasurer, secretary and a member of the board of directors from January 2000 until he left Stansbury's employment in October 2002.  Staal is a certified public accountant.

22.     Sellers, a resident of Richfield, Utah, has been the president and sole shareholder of Sellers & Associates since 1998.  Sellers is a certified public accountant.

23.     Sellers & Associates is an accounting firm located in Richfield, Utah.  Sellers is the only shareholder of, and the only certified public accountant affiliated with, the firm.  Sellers & Associates, and Sellers, audited or reviewed Stansbury's financial statements filed with the Commission for the periods ended June 30, 2001 through March 31, 2002.

## GENERAL ALLEGATIONS

**Stansbury's False and Misleading Financial Statements**

24.     The financial statements that Stansbury filed with the Commission on a quarterly and annual basis from June 1999 through May 2002 showed a company with assets of $19.2 million to $25.5 million each year.

25.     In fact, Stansbury overstated its assets in its quarterly and annual financial statements with the Commission for these periods.  The following Commission filings were materially false:  (a) Stansbury's Form 10-KSB for the period ended June 30, 1999, which reported assets of $19.2 million; (b) Stansbury's Form 10-QSB for the period ended September 30, 1999, which reported assets of $19.3 million; (c) Stansbury's Form 10-QSB for the period ended December 31, 1999, which reported assets of $19.5 million; (d) Stansbury's Form 10-QSB for the period ended March 31, 2000, which reported assets of $19.6 million; (e) Stansbury's Form 10-KSB for the period ended June 30, 2000, which reported assets of $20.2 million; (f) Stansbury's Form 10-Q for the period ended September 30, 2000, which reported assets of $25.1 million; (g) Stansbury's Form 10-Q for the period ended December 31, 2000, which reported assets of $25.4 million; (h) Stansbury's Form 10-Q for the period ended March 31, 2001, which reported assets of $25.5 million; (i) Stansbury's Form 10-KSB for the period ended June 30,

2001, which reported assets of $24.9 million; (j) Stansbury's Form 10-Q for the period ended September 30, 2001, which reported assets of $24.9 million; (k) Stansbury's Form 10-Q for the period ended December 31, 2001, which reported assets of $24.9 million; and (l) Stansbury's Form 10-Q for the period ended March 31, 2002, which reported assets of $24.9 million.

26.     Coffman prepared, reviewed, signed and approved all of Stansbury's Form 10-KSB, Form 10-QSB and Form 10-Q reports referenced in Paragraph 25.

27.     Staal reviewed, signed and approved the company's Form 10-KSB reports for the years ended June 30, 2000 and June 30, 2001, and the company's Form 10-QSB and Form 10-Q reports for the quarters ended March 31, 2000, September 30, 2000, and September 30, 2001.

28.     From on or about October 2000, and continuing through at least May of 2001, Stansbury disseminated a private placement memorandum and raised approximately $960,000 through a private offering.  The private placement memorandum included materially false financial statements for the fiscal year ended June 30, 1999 and for the quarter ended March 31, 2000.

29.     Sellers and Sellers & Associates audited Stansbury's financial statements for the year ended June 30, 2001, which were included in Stansbury's Form 10-KSB referenced in paragraph 25.

30.     Sellers and Sellers & Associates reviewed the financial statements for the quarters ended September 30, 2001, December 31, 2001, and March 31, 2002.  These financial statements were included in the Forms 10-Q referenced in Paragraph 25.

**Stansbury's Overstatement of Assets**

31.     Stansbury reported in its financial statements for the periods ended June 30, 1999 through March 31, 2002, that it held approximately $18.7 million to $19.2 million in assets based

on the value of the mining rights for properties located in Hamilton, Montana and Dillon, Montana.

32.     Stansbury, Coffman, and Staal disregarded numerous events showing that the properties were impaired and worth far less than the reported value claimed in the financial statements referred in paragraphs 24 through 31.

33.     Stansbury had originally intended to use its mining rights for the Hamilton property to extract vermiculite.  However, by the fall of 1998, Stansbury had determined that it would focus on mining a different property instead.  By the time Stansbury filed its Form 10-KSB for the year ended June 30, 2000, Stansbury further acknowledged that drilled ore bodies at Hamilton were of "modest commercial potential" and would be reassessed.  By 2001, Stansbury had changed its focus to mining garnet rather than vermiculite.

34.     In all the financial statements, Stansbury recorded an asset value for the Hamilton property mining rights of approximately $15 million, an amount which represented between 59% and 78% of Stansbury's total reported assets.

35.     In fact, the value of the Hamilton mining rights was impaired under GAAP. Stansbury's decisions to significantly scale back anticipated operations for the Hamilton property, to reassess ore bodies at Hamilton, and to focus its operations on mining garnet rather than vermiculite each represented events that should have triggered an impairment analysis under GAAP.  Since Stansbury could not demonstrate that the asset had any fair value, and since Stansbury itself did not intend to conduct significant mining operations there, under GAAP requirements, Stansbury should have written off substantially all of the value for the Hamilton property upon each triggering event.

36.     Throughout the relevant time period, Stansbury valued the Dillon property mining rights at approximately $3.7 million to $4.2 million.

37.     In fact, the value of the Dillon mining rights was impaired.  When Stansbury acquired the Dillon property, Stansbury intended to focus its vermiculite mining efforts there rather than on the Hamilton property.  However, in late 1999, Montana state environmental regulators began the process to revoke Stansbury's permit to mine the Dillon property due to concerns relating to potential asbestos content.  After that point, Stansbury was required to restrict any mining at Dillon to a five acre area.  During limited mining operations over a four month period from November 2000 through February 2001, Stansbury determined that it could not produce the quantities of vermiculite at Dillon that it had expected.

38.     By 2001, Stansbury had changed its focus to mining garnet on the Dillon property.  However, it never commenced any garnet mining operations.

39.     The negative events impacting the Dillon property – including the restriction of Stansbury's mining permit, Stansbury's determination that it could not produce the quantities of vermiculite it had anticipated, and Stansbury's decision to focus its operations on mining garnet rather than vermiculite – should have triggered an impairment analysis for the Dillon asset under GAAP.  Since Stansbury could not demonstrate that the asset had any fair value, Stansbury should have written off substantially all of the value for the Dillon property upon each triggering event in order to comply with GAAP.  In addition, after it had determined not to focus on mining vermiculite, Stansbury should have written off substantially all of the value.

40.     The inflated valuation of Stansbury's assets resulted in materially false financial statements in each of Stansbury's financial statements filed with the Commission from September 30, 1999 through May 14, 2002.

41.     Coffman, who prepared, reviewed and signed every Stansbury filing that included the materially overstated assets, knew or was reckless in not knowing that the assets were impaired. Coffman knew the following impairment events: the foreclosure proceedings relating to the Hamilton and Dillon properties when they were filed; by June 30, 1999 that Stansbury had decided not to focus future mining efforts on the Hamilton property; by mid-2000 that Stansbury's future in mining any vermiculite was in question; by early 2001 that the Dillon property was not producing the quality of vermiculite ore that was anticipated; the requirement that Stansbury restrict any mining at Dillon to a five acre area; and by mid-2001, Stansbury's decision to mine garnet rather than vermiculite.

42.     However, Coffman failed to adjust the value of Stansbury's reported assets to reflect the actual value of its holdings.

43.     Coffman was responsible for the content of Stansbury's filings with the SEC and specifically for recommending that Stansbury record its mineral assets in the manner that it did. Staal, who reviewed and signed Stansbury's filings on Forms 10-KSB for the years ended June 30, 2000 and June 30, 2001, and Stansbury's Forms 10-Q or 10-QSB for the quarters ended March 31, 2000, September 30, 2000, and September 30, 2001, that included the materially overstated assets, knew or was reckless in not knowing that the assets were impaired. Staal knew the following impairment events: the foreclosure proceeding relating to the Hamilton property; that Stansbury had significantly curtailed its plans to mine the Hamilton property; that the quality of the minerals produced at Hamilton were of modest commercial potential; and that Stansbury had changed its business focus from mining vermiculite to mining garnet.  However, Staal failed to adjust the value of Stansbury's reported assets to reflect the actual value of its holdings.

44.     Staal was involved in the day-to-day accounting processes and financial decision-making at Stansbury.  Staal, as CFO, was ultimately responsible for the manner in which Stansbury recorded its assets.

45.     Coffman, who was the chief executive officer when the private placement memorandum was prepared and disseminated, had reviewed it and provided the information to draft it.  Staal, who was the chief financial officer when the private placement memorandum was prepared and disseminated, had reviewed it.  Coffman and Staal knew or were reckless in not knowing that Stansbury's 1999 Form 10-KSB and Form 10-QSB for the quarter ended March 31, 2000, which were included in the private placement memorandum, contained financial statements that overstated Stansbury's assets.  They were reckless because of their knowledge as referenced in paragraphs 41 and 43.

46.     Since Coffman was the chief executive officer, president, and a director of Stansbury, Coffman's knowledge of the false statements about the value of the properties in the annual reports and quarterly reports that he reviewed and signed is attributed to Stansbury.  Since Staal was the chief financial officer, treasurer, secretary, and a director of Stansbury, Staal's knowledge of the false statements about the value of the properties in the annual reports and quarterly reports that he reviewed and signed is attributed to Stansbury.

**Failure to Disclose Possible Losses from Foreclosure Proceedings**

47.     Foreclosure proceedings affecting Stansbury's mining rights at Hamilton were filed on December 19, 2000.  In its annual report for the year ended June 30, 2001 and in its quarterly reports for the quarters ended December 31, 2000, March 31, 2001, September 30, 2001, and December 31, 2001, Stansbury failed to disclose a possible loss relating to the Hamilton asset in its financial statements as required by GAAP.

48.     Coffman and Staal knew or recklessly disregarded facts indicating that Stansbury should have disclosed a possible loss relating to the Hamilton property, in its financial statements.

49.     Coffman knew the following impairment events: the foreclosure proceedings relating to the Hamilton and Dillon properties when they were filed; by June 30, 1999 that Stansbury had decided not to focus future mining efforts on the Hamilton property; by mid-2000 that Stansbury's future in mining any vermiculite was in question; by early 2001 that the Dillon property was not producing the quality of vermiculite ore that was anticipated; the requirement that Stansbury restrict any mining at Dillon to a five acre area; and by mid-2001, Stansbury's decision to mine garnet rather than vermiculite.

50.     Staal knew the following impairment events: the foreclosure proceeding relating to the Hamilton property; that Stansbury had significantly curtailed its plans to mine the Hamilton property; that the quality of the minerals produced at Hamilton were of modest commercial potential; and that Stansbury had changed its business focus from mining vermiculite to mining garnet.  However, Staal failed to adjust the value of Stansbury's reported assets to reflect the actual value of its holdings.

51.     On March 1, 2002, a Montana state court entered a final judgment against Stansbury, ordering that Stansbury's Hamilton mining rights be sold in a sheriff's sale to satisfy the judgment.

52.     After this judgment, Stansbury failed to disclose a loss relating to its Hamilton mining rights or to write off any of the recorded value for the Hamilton asset in its quarterly report for the quarter ended March 31, 2002, in violation of GAAP.

12

53.    Foreclosure proceedings affecting Stansbury's mining rights at Dillon were filed on November 13, 2001.

54.    After these foreclosure proceedings were filed, Stansbury failed to disclose a possible loss relating to the Dillon asset in its quarterly reports or financial statements in violation of GAAP.

55.    Coffman knew or recklessly disregarded facts indicating that Stansbury should have disclosed possible loss as relating to the Hamilton and Dillon assets and that Stansbury should have written off the recorded value for the Hamilton asset in its quarterly report for the quarter ended March 31, 2002 because he knew the following impairment events: the foreclosure proceedings relating to the Hamilton and Dillon properties when they were filed; by June 30, 1999 that Stansbury had decided not to focus future mining efforts on the Hamilton property; by mid-2000 that Stansbury's future in mining any vermiculite was in question; by early 2001 that the Dillon property was not producing the quality of vermiculite ore that was anticipated; the requirement that Stansbury restrict any mining at Dillon to a five acre area; and by mid-2001, Stansbury's decision to mine garnet rather than vermiculite.

**False Statements in Audit Reports**

56.    Sellers and Sellers & Associates issued an audit report relating to Stansbury's year-end financial statements for 2001.  Stansbury included the audit report in its Form 10-KSB for the fiscal year ended June 30, 2001.

57.    The 2001 audit report falsely stated that the financial statements were presented fairly in all material respects in conformity with GAAP and that the audit of these financial statements was conducted in accordance with Generally Accepted Auditing Standards (GAAS).

58.     Sellers and Sellers and Associates failed to conduct their audit of Stansbury's June 30, 2001 financial statements in accordance with GAAS because they failed to exercise due professional care, and to obtain sufficient competent evidential matter.  They also improperly relied upon management's representations.  Therefore, the statement in the audit report referenced in the paragraph above, that Sellers & Associates' audit of Stansbury's 2001 financial statements was conducted in accordance with GAAS, was false.

59.     The statement in the audit report referenced in paragraph 56 above, that Stansbury's financial statements for 2001 were presented in conformity with GAAP, was false, because, as discussed above, these financial statements included numerous financial misstatements.  Because Sellers did not conduct his audit in accordance with generally accepted auditing standards, he could not opine on whether Stansbury's financial statements conformed with GAAP.

60.     Commission rules required Stansbury to file annual reports.

**Failures Related to the Quarterly Reviews**

61.     Commission rules require quarterly reviews by certified public accountants in order for Stansbury to file periodic reports with the Commission.  Stansbury failed to obtain the required reviews of its interim financial information by an outside auditor for the quarters ended March 31, 2000, September 30, 2000, December 31, 2000, and March 31, 2001.

62.     Quarterly reviews by Sellers & Associates were performed for the quarters ended September 30, 2001, December 31, 2001, and March 31, 2002.  During this time period, Stansbury carried the values of the Hamilton and Dillon assets without any impairment.  In addition, the Hamilton and Dillon assets were subject to foreclosure proceedings, and a final judgment was entered ordering the foreclosure of the Hamilton property.

14

63.     Sellers had knowledge of impairment triggering events during the time period that he was responsible for Stansbury's quarterly reviews.  Still, he never determined that an impairment analysis should be performed to assess whether the asset valuations for Hamilton and Dillon should be adjusted as required by GAAP.

64.     Sellers failed to follow up on the foreclosure proceedings in the course of any of his quarterly reviews for the first three quarters of Stansbury's 2002 fiscal year.  Sellers knew that there had been a foreclosure on one of Stansbury's mineral properties, and that the value of the debt to be relieved was greater than the actual value of the property.  However, Sellers did not require that Stansbury adjust the value of the Hamilton asset in the proper quarter.

**Stansbury's Inaccurate Books, Records and Accounts and Deficient Internal Controls**

65.     Stansbury was required to maintain books, records and accounts which accurately and fairly reflected its transactions and the disposition of its assets.

66.     In fact, Stansbury failed to maintain complete or accurate books, records and accounts for its mining assets.

67.     Coffman and Staal, directly or indirectly, falsely recorded the value of Stansbury's assets in the books, records and accounts required to be maintained by Stansbury.

68.     Stansbury also was required to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances concerning the recording and accountability for Stansbury's assets.

69.     In fact, Stansbury failed to devise and maintain such a system of internal accounting controls.

70.     Coffman and Staal knowingly circumvented or knowingly failed to implement a system of internal accounting controls for Stansbury.

**Stansbury's Delinquent Filings**

71.     As a public company registered with the Commission pursuant to the provisions of the Exchange Act, Stansbury was required to file periodic reports with the Commission until July 2003.

72.     Stansbury failed to file an annual report and for its fiscal year ended June 30, 2002.  Coffman and Staal were responsible for Stansbury's failure to file.

73.     Stansbury also failed to file its quarterly report for the quarter ended September 30, 2002.  Coffman was responsible for Stansbury's failure to file.

**Stansbury Offered and Sold its Securities using the Fraudulent Financial Statements**

74.     From June of 2000 through May of 2002, Stansbury raised approximately $2 million through a private placement and sales of promissory notes and other shares.

75.     Stansbury's private placement memorandum was dated August 2000 and updated on October 11, 2000.  The private placement memorandum attached Stansbury's 1999 Form 10-KSB and its Form 10-QSB for the quarter ended March 31, 2000.

76.     Coffman provided information for drafting the private placement memorandum. Coffman was referenced in the promissory notes as the contact person for Stansbury.  Coffman received monies from investors, signed the promissory notes, and arranged for the investors to receive shares of stock.  Coffman also determined the use of monies raised and when to repay investors on their promissory notes or to exchange stock for the required payments

## FIRST CLAIM

**(Violations by Stansbury, Coffman and Staal of Section 17(a)(1)
of the Securities Act [15 U.S.C. § 77q(a)])**

77.     Plaintiff repeats and realleges paragraphs 1 through 76 above.

78.     Stansbury, Coffman and Staal, directly or indirectly, with scienter, in the offer and sale of Stansbury securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, have employed devices, schemes, or artifices to defraud.

79.     By reason of the foregoing, Stansbury, Coffman and Staal violated, and unless restrained and enjoined will violate Section 17(a)(1) of the Securities Act.

## SECOND CLAIM

**(Violations by Stansbury, Coffman and Staal of Sections 17(a)(2)
and 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(2) and 77q(a)(3)])**

80.     Plaintiff repeats and realleges paragraphs 1 through 76 above.

81.     Stansbury, Coffman and Staal, directly or indirectly, in the offer and sale of Stansbury securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, have obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; or have engaged in transactions, practices, or courses of business which have been, or are operating as a fraud or deceit upon the purchasers of such securities.

82.     By reason of the foregoing, Stansbury, Coffman and Staal violated, and unless restrained and enjoined will violate Sections 17(a)(2) and (3) of the Securities Act.

## THIRD CLAIM

### (Violations by Stansbury, Coffman and Staal of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5])

83.     Plaintiff repeats and realleges paragraphs 1 through 76 above.

84.     Stansbury, Coffman and Staal, directly or indirectly, with scienter, in connection with the purchase or sale of securities, by use of the means or instrumentalities of interstate commerce or by use of the mails, have employed devices, schemes, or artifices to defraud; have made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or have engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers or sellers of such securities.

85.     By reason of the foregoing, Stansbury, Coffman and Staal violated, and unless restrained and enjoined will violate Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

## FOURTH CLAIM

### (Aiding and Abetting by Sellers and Sellers & Associates of Stansbury's Violations of Section 10(b) of the Exchange Act and Rule 10b-5

86.     Plaintiff repeats and realleges paragraphs 1 through 76 above.

87.     During Stansbury's 2001 fiscal year, Sellers permitted accounting treatment of asset valuation contrary to generally accepted accounting principles.  Furthermore, through Sellers, Sellers & Associates issued an audit opinion even though Sellers knew or was reckless in not knowing the financial statements were materially false and misleading and were not prepared in conformity with generally accepted accounting principles.

88.     Sellers also aided and abetted Stansbury's fraud through his quarterly reviews of Stansbury's financial statements for the first three quarters of Stansbury's 2002 fiscal year, when he failed to require appropriate disclosure and adjustment of Stansbury's asset accounts based upon impairment events and the foreclosure proceedings.

89.     Sellers and Sellers & Associates aided and abetted Stansbury's violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder and substantially assisted Stansbury in committing these violations.

90.     By reason of the foregoing, Sellers and Sellers & Associates aided and abetted and unless restrained and enjoined will aid and abet violations of Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5.

## FIFTH CLAIM

**(Stansbury's Violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)]
and Rules 12b-20, 13a-1, and 13a-13 [17 C.F.R. §§ 240.12b-20,
240.13a-1, and 240.13a-13])**

91.     Plaintiff repeats and realleges paragraphs 1 through 76 above.

92.     Throughout the relevant period, Stansbury was subject to the periodic reporting requirements imposed by the Exchange Act on companies having securities registered with the Commission.  As described elsewhere in this Complaint, the periodic filings made by Stansbury during the relevant period were materially inaccurate.

93.     Stansbury also failed to add such further material information as was necessary to make the required statements or reports, in the light of the circumstances under which they were made, not misleading.

94.     Furthermore, for the periods ended June 30, 2002 and September 30, 2002, Stansbury failed to file required reports with the Commission.

95.     By reason of the foregoing, Stansbury violated, and unless restrained and enjoined will violate Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder.

## SIXTH CLAIM

**(Aiding and Abetting by Coffman, Staal, Sellers and Sellers & Associates of Stansbury's Violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13)**

96.     Plaintiff repeats and realleges paragraphs 1 through 76 above.

97.     Coffman, Staal, Sellers and Sellers & Associates knew or were reckless in not knowing that Stansbury filed materially inaccurate and misleading annual and quarterly reports with the Commission and failed to add such further material information as was necessary to make the required statements or reports, in light of the circumstances under which they were made, not misleading, in violation of Section 13(a) of the Exchange Act and Exchange Act Rules 12b-20, 13a-1, and 13a-13, and substantially assisted Stansbury in committing these violations.

98.     By reason of the foregoing, Coffman, Staal, Sellers and Sellers & Associates aided and abetted and unless restrained and enjoined will aid and abet violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder.

## SEVENTH CLAIM

**(Stansbury's Violations of Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)])**

99.     Plaintiff repeats and realleges paragraphs 1 through 76 above.

100.    Throughout the relevant period, Stansbury failed to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected the company's transactions and dispositions of its assets.

101.    By reason of the foregoing, Stansbury violated, and unless restrained and enjoined will violate Section 13(b)(2)(A) of the Exchange Act.

## EIGHTH CLAIM

### (Aiding and Abetting by Coffman and Staal of Stansbury's Violations of Section 13(b)(2)(A) of the Exchange Act)

102.    Plaintiff repeats and realleges paragraphs 1 through 76 above.

103.    Until at least December 2002, Coffman knew or was reckless in not knowing of Stansbury's violations of Section 13(b)(2)(A) of the Exchange Act and substantially assisted Stansbury in committing these violations.

104.    Until his resignation from Stansbury in October 2002, Staal knew or was reckless in not knowing of Stansbury's violations of Section 13(b)(2)(A) of the Exchange Act and substantially assisted Stansbury in committing these violations.

105.    By reason of the foregoing, Coffman and Staal aided and abetted and unless restrained and enjoined will aid and abet violations of Section 13(b)(2)(A) of the Exchange Act.

## NINTH CLAIM

### (Stansbury's Violations of Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)])

106.    Plaintiff repeats and realleges paragraphs 1 through 76 above.

107.    Throughout the relevant period, Stansbury failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions were recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and to maintain accountability for assets; and the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

108.    By reason of the foregoing, Stansbury violated, and unless restrained and enjoined will violate Section 13(b)(2)(B) of the Exchange Act.

## TENTH CLAIM

### (Aiding and Abetting by Coffman and Staal of Stansbury's Violations of Section 13(b)(2)(B) of the Exchange Act)

109.    Plaintiff repeats and realleges paragraphs 1 through 76 above.

110.    Until at least December 2002, Coffman knew or was reckless in not knowing of Stansbury's violations of Section 13(b)(2)(B) of the Exchange Act and substantially assisted Stansbury in committing these violations.

111.    Until his resignation from Stansbury in October 2002, Staal knew or was reckless in not knowing of Stansbury's violations of Section 13(b)(2)(B) of the Exchange Act and substantially assisted Stansbury in committing these violations.

112.    By reason of the foregoing, Coffman and Staal aided and abetted and unless restrained and enjoined will aid and abet violations of Section 13(b)(2)(B) of the Exchange Act.

## ELEVENTH CLAIM

### (Violations by Stansbury, Coffman and Staal of Rule 13b2-1 Under the Exchange Act [17 C.F.R. § 240.13b2-1])

113.    Plaintiff repeats and realleges paragraphs 1 through 76 above.

114.    Throughout the relevant period, Stansbury and Coffman directly or indirectly falsified or caused to be falsified books, records or accounts subject to Section 13(b)(2)(A) of the Exchange Act.

115.    Between January 2000 and October 2002, Staal directly or indirectly falsified or caused to be falsified Stansbury's books, records or accounts subject to Section 13(b)(2)(A) of the Exchange Act.

116.     By reason of the foregoing, Stansbury, Coffman and Staal violated, and unless restrained and enjoined will violate Rule 13b2-1 under the Exchange Act.

## TWELFTH CLAIM

### (Violations by Coffman and Staal of Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)])

117.     Plaintiff repeats and realleges paragraphs 1 through 76 above.

118.     Between May 1999 and at least December 2002, Coffman knowingly circumvented or knowingly failed to implement a system of internal accounting controls and knowingly falsified books, records, or accounts described in Section 13(b)(5) of the Exchange Act.

119.     Between January 2000 and October 2002, Staal knowingly circumvented or knowingly failed to implement a system of internal accounting controls and knowingly falsified a books, records, or accounts described in Section 13(b)(5) of the Exchange Act.

120.     By reason of the foregoing, Coffman and Staal violated, and unless restrained and enjoined will violate Section 13(b)(5) of the Exchange Act.

## RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that the Court:

## I.

Find that the defendants, and each of them, committed the violations alleged.

## II.

Enter an injunction, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently restraining and enjoining each defendant, his or its agents, servants, employees and attorneys, and those persons in active concert or participation with them who

receive actual notice of a judgment by personal service or otherwise, and each of them, from violating, directly or indirectly, the provisions of law and rules alleged in this Complaint.

### III.

Order Coffman and Staal to disgorge and pay over, as the Court may direct, all ill-gotten gains received or benefits in any form derived from the illegal conduct alleged in this Complaint, together with pre-judgment and post-judgment interest as provided by law.

### IV.

Order Coffman and Staal to pay civil money penalties pursuant to Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act.

### V.

Order Sellers and Sellers & Associates to pay civil money penalties pursuant to Section 21(d)(3) of the Exchange Act.

### VI.

Enter an Order barring Coffman and Staal from serving as an officer or director of any publicly held company pursuant to Section 20(e) of the Securities Act, Section 21(d)(2) of the Exchange Act, as amended by Section 305 of the Sarbanes-Oxley Act, and the general equitable powers of the Court.

### VII.

Enter an Order barring Coffman from participating in any offering of penny stock pursuant to Section 20(g) of the Securities Act, Section 21(d)(6) of the Exchange Act, as amended by Section 603 of the Sarbanes-Oxley Act, and the general equitable powers of the Court.

## VIII.

Grant such other relief as this Court may deem just or appropriate.

Dated:  January 19, 2006

Respectfully submitted,

s/ Elizabeth E. Krupa
Elizabeth E. Krupa, Colo. Bar No. 26028
KrupaE@sec.gov
Polly A. Atkinson, Colo. Bar No. 18703
AtkinsonP@sec.gov
Attorneys for Plaintiff
Securities and Exchange Commission
1801 California Street, Suite 1500
Denver, Colorado 80202
Phone:  (303) 844-1000
Fax:  (303) 844-1068

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on January 19, 2006, a true and correct copy of the foregoing **COMPLAINT** along with a **Notice of Lawsuit and Request for Waiver of Service of Summons** were served by overnight mail, upon the following:

David Zisser, Esq.
Counsel for Aldine J. Coffman, Jr.
Isaacson, Rosenbaum, Woods & Levy, P.C.
633 17th Street, Suite 2200
Denver, CO  80202
(303) 256-3952

Martin Berliner, Esq.
Counsel for Dennis R. Staal
Berliner McDonald
5670 Greenwood Plaza Blvd., Suite 418
Greenwood Village, CO  80111
(303) 830-1700, ext. 2

Stansbury Holdings Corporation
Brian E. McCarty, President
1027 Spruce Street, Apartment 4
Philadelphia, PA 19107
(215) 468-0386

Richard E. Sellers, CPA
475 North 300 West
Richfield, Utah 84701

Sellers & Associates P.C.
Richard E. Sellers, CPA, President
475 North 300 West
Richfield, Utah 84701

s/ Elizabeth E. Krupa