**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Robert E. Blackburn, Judge**

Civil Case No. 06-cv-00088-REB-BNB

SECURITIES AND EXCHANGE COMMISSION,

      Plaintiff,

v.

ALDINE J. COFFMAN, JR.,
RICHARD E. SELLERS, CPA, and,
SELLERS & ASSOCIATES P.C.,

      Defendants.

---

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDERS**

---

**Blackburn, J.**

      This matter came before me for a trial to the court from July 30, 2007 through

August 1, 2007.  Having judicially noticed all relevant adjudicative facts in the file and

record of this case *pro tanto*; having considered and accepted the stipulations of the

parties; having considered the evidence educed in its various forms; having determined

the credibility of the witnesses; having weighed the evidence; having considered the

reasons stated, arguments advanced, and the authorities cited by the parties in written

and oral form; and being otherwise sufficiently advised, I enter the following findings of

fact established by a preponderance of the evidence, conclusions of law, and orders.[1]

---

[1] Any finding of fact more properly deemed a conclusion of law, or any conclusion of law more
properly deemed a finding of fact, shall be as more properly characterized. *See **Houck v. Hinds**,* 215
F.2d 673, 676 (10th Cir. 1954).

## I.  JURISDICTION AND VENUE

This case is a civil enforcement action brought by the United States Securities and Exchange Commission (SEC).  I have subject matter jurisdiction under the Securities Act, 15 U.S.C. §§ 77t and 77v(a), under the Securities Exchange Act, 15 U.S.C. § 78u(e) and 78aa, and under 28 U.S.C. § 1333 (federal question).  Venue lies in this Court under 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b) & (c).

## II.  FINDINGS OF FACT

### A.  Stansbury Holdings Corporation

1.  This case concerns financial reporting by Stansbury Holdings Corporation (Stansbury).  Stansbury was incorporated as a Utah corporation on May 7, 1969, under the name Stansbury Mining Corporation.  Exhibit 46, p. 3.

2.  During the time period relevant to this case, Stansbury's common stock was registered with the SEC under Section 12(g) of the Exchange Act and quoted on the National Quotation Bureau's pink sheets.  The registration of Stansbury's common stock was revoked on July 14, 2003.

3.  Stansbury filed periodic reports with the SEC on Forms 10-KSB, 10-QSB, and/or 10-Q from June 30, 1999 through March 31, 2002.[2]

4.  Stansbury was required to file financial statements with the SEC that complied with Generally Accepted Accounting Principles (GAAP).

5.  Stansbury's primary business was the development and mining of vermiculite mining claims in Montana.

---

[2] Stansbury filed other periodic reports with the SEC concerning other reporting periods, but those reports are not at issue in this case.

6.  This case concerns the SEC's claims that the defendants violated various provisions of the Securities Act, the Securities Exchange Act, and rules promulgated thereunder.  The SEC claims that defendants Aldine Coffman, Richard Sellers, and Sellers & Associates violated these laws when they failed to write down the value of two mining properties owned by Stansbury on the books and records of Stansbury, and in the financial reports of Stansbury, as filed with the SEC.

### B. The Defendants

7.  Defendant Aldine J. Coffman is an attorney admitted to practice in Virginia and Utah.  Sometime in 1998, defendant Aldine Coffman was retained by Stansbury to provide legal services.  On October 24, 1998, Coffman became an Executive Vice President and Director of Stansbury.  Exhibit 46, page 6.  He signed Stansbury's Form 10-KSB for its fiscal year ended 1998 as a director.  Id., p. 24.  On May 15, 1999, Coffman became Stansbury's Chief Executive Officer (CEO), President, and the Chairman of its Board of Directors.  Exhibit 46, page 19.  As President and CEO, he helped to prepare and signed Stansbury's annual and quarterly reports filed with the SEC during the period relevant to this case.  Exhibits 34 through 45.

8.  Defendant Richard E. Sellers is a Certified Public Accountant who was engaged to perform two audits of the financial statements of Stansbury.  Sellers performed audits of Stansbury for the fiscal years ended 1997 and 1998, and for the fiscal year ended 2001.  Stansbury had a fiscal year end of June 30.

9.  Defendant Sellers & Associates, P.C., was an accounting firm operated by Richard Sellers and licensed in the State of Utah.  Sellers & Associates is no longer in existence.

3

10.   Both before and after Coffman joined Stansbury as an officer and director, Stansbury was in extremely weak financial condition.  Stansbury never had been able to produce any vermiculite for sale and, as a result, never had generated any revenue. The company survived primarily through the sale of stock to and loans from various investors.  Stansbury's extremely weak financial condition, its inability to generate revenue, and its reliance on investment for its continued survival were disclosed consistently in its filings with the SEC.  Exhibits 34 through 46.

11.   Coffman's plan to make Stansbury a successful company was to generate revenue through the production of vermiculite, and the purchase of other assets that could generate revenue.  Coffman also anticipated entering into joint ventures with entities that had the financial ability to extract saleable minerals from Stansbury's mining assets, in return for which the co-joint venturer would receive a portion of the revenue stream.

### C.  Stansbury's Mining Properties

12.   The accounting reporting periods that are relevant to this case cover the periods ending June 30, 1999, through March 31, 2002.

13.   During this span of time, Stansbury owned three different mining properties, the Hamilton property, the Dillon property, and the Sweetwater property.

14.   For many years, Stansbury owned mining claims on land near Hamilton, Montana. This land contained a mineral called vermiculite.  This set of claims is known as the Hamilton property.

15.   In June, 1999, Stansbury acquired vermiculite assets known as the Dillon property.  This property sometimes is called the Elk Creek or Elk Gulch property.

16.  In July, 2000, Stansbury purchased a garnet project near its Dillon vermiculite project.  The garnet project is known as Sweetwater Garnet.

### D.  Stansbury's Reported Valuations of its Mining Properties

<u>i.  Hamilton</u>

17.  On June 10, 1985, Stansbury reorganized as part of an approved plan of reorganization under Chapter 11 of the Federal Bankruptcy Code. In connection with the Stansbury bankruptcy, the Bankruptcy Court assigned a fair market value of $34,577,270 to the Hamilton property.  Exhibit 56, Order Establishing Value of Debtor's Assets, March 22, 1985, p. 000232.

18.  In 1998 Coffman was retained by Stansbury to provide Stansbury with legal services.  Coffman examined Stansbury's records and determined that the Hamilton property was carried on Stansbury's books at a value that had been determined by an appraisal of values submitted to the bankruptcy court in the reorganization plan. Coffman suggested that Stansbury needed to restate the value of Hamilton in accordance with GAAP, and state the value as the lesser of fair market value or capitalized cost. Coffman Testimony, 3-18-04, p. 49, l. 16 - p. 50, l. 11.  Sellers agreed with this assessment.  Id.

19.  Stansbury's Board of Directors accepted Coffman's recommendation and reclassified and restated its assets from $36,811,743 as of June 30, 1996, to $14,814,215 as of June 30, 1996.  Exhibit 46. p. 3.  This restatement of value concerned the Hamilton property.

20.  In June of 1998, Dr. James Hindman produced a report evaluating the vermiculite deposit on the Hamilton property.  Exhibit 18.  Dr. Hindman had substantial

experience and expertise with vermiculite.  Dr. Hindman valued the Hamilton vermiculite deposit at $51 million.  Exhibit 18, p. 8.  Dr. Hindman explicitly excluded from his value analysis the cost of mining, processing, and marketing the vermiculite. Id., p. 6.

21.  Stansbury reported in its June 30, 1999, form !0-KSB that its restated valuation of Hamilton was determined on a cost basis, and that its previous valuation of Hamilton was based on fair market value.  Exhibit 45, p. 2.  During the reporting periods at issue in this case, Hamilton was carried on Stansbury's books at a value that was represented as having been determined on a cost basis.  Exhibits 34 - 45.

ii.  Dillon

22.  The Dillon property was acquired by Stansbury in June, 1999. The Dillon property was valued in Stansbury's filings at what Stansbury paid for it.  The cost was the value of the stock issued by Stansbury in the purchase transaction, plus the cash committed to the purchase price.  Coffman Testimony,  5-9-06, p. 63, l. 16 – 21; p. 79, l. 4 – p. 80, l. 10; p. 81, l. 14 - 18.  Initially, the cost of the Dillon property was represented as $4.04 million, with $50,000 of that amount attributed to the office and warehouse building on the Dillon property, and the remainder attributed to the undeveloped mining claims and projects.  Exhibit 45, p. 30. Thus, the cost of acquiring Dillon was $3.99 million, which Stansbury paid through a combination of cash, stock, and the assumption of debt.

23.  An analysis performed by Dr. Hindman in 1997, which recommended the acquisition of the Dillon properties, concluded that vermiculite deposits at Dillon represented marketable concentrates worth $101 million.  Exhibit 18, p. 9.

24.  During the reporting periods at issue in this case, Dillon was carried on Stansbury's books at a value that was represented as having been determined on a cost basis.  Exhibits 34 - 45.

**E.  Triggering Events**

25.  Stansbury was required to follow Generally Accepted Accounting Principles (GAAP), including Financial Accounting Standard No. 121 (FAS 121), in maintaining its books and in making its public filings with the SEC.

26.  The SEC claims that under FAS 121 several events each required Stansbury to review the carrying value of its Hamilton and Dillon properties, as reflected on Stansbury's books and in Stansbury's public filings.  Under FAS 121, such events are called triggering events.  The relevant triggering events are outlined below.

27.  The SEC claims Stansbury failed to conduct properly the required reviews of the carrying values of Hamilton and Dillon following the triggering events.  As a result of these improper reviews, the SEC claims that Stansbury's books and public filings reflected material over-valuations of Stansbury's Hamilton and Dillon properties.

<u>i.   Hamilton</u>

28.  In 1999, after acquiring the Dillon properties, Stansbury decided to pursue vermiculite mining at Dillon first, and to delay mining at Hamilton.  Coffman Testimony, 5-9-06, pp. 21 - 33.

29.  On December 19, 2000, foreclosure proceedings were initiated against Stansbury's mining rights at Hamilton.  Exhibit 31.  Stansbury disclosed the initiation of the foreclosure action against the Hamilton property in its Form 10Q for the period ended December 31, 2000.  Exhibit 39, p. 16. On January 24, 2002, the plaintiffs in the

Hamilton foreclosure action received summary judgment allowing the foreclosure to proceed to sale.  Exhibit 33.  Stansbury disclosed in its Form 10-Q for the period ending December 31, 2001, that the court handling the foreclosure action had ruled that "the plaintiffs may proceed to foreclosure."  Exhibit 35, p. 14.

<u>ii.  Dillon</u>

30.  In the summer of 2000, the State of Montana revoked the permit for mining at Dillon, pending the result of an environmental impact statement (EIS).  Stansbury concluded that it did not have the money to prepare an EIS.  Stansbury continued mining at Dillon under a five acre small mine exclusion, as opposed to the seventy-five acre permit that had been revoked.  Stansbury reported in its June 30, 2000, Form 10-K that mining at Dillon was being conducted under a small miner's exclusion permit, and that operations were limited to a disturbance of five acres.  Exhibit 41, p. 9.

31.  By March of 2001, Stansbury had shut down operations at Dillon because the quality of the vermiculite coming out of the mill was not meeting the expected standards.  Initially, this was intended to be a temporary closing.

32.  At some time in 2001, Stansbury was given a notice of default on the payment of minimum royalties due on the Dillon property.  This notice was disclosed in Stansbury's From 10-K for the period ending June 30, 2001.  Exhibit 37, p. 13.

33.  On November 13, 2001, foreclosure proceedings were filed concerning Stansbury's Dillon property.  The foreclosure proceeding was brought by a group of claim holders who had retained a royalty interest in the property.  Stansbury had not paid the minimum royalty, and the foreclosure was brought to recover the property. The foreclosure was based on a claim that Stansbury had failed to pay $147,000, plus

interest.  The filing of the lawsuit to collect these royalties was disclosed in Stansbury's Form 10-Q for the period ending December 31, 2001.  Exhibit 35, p. 14.

34.  Sometime in 2001, Stansbury decided to focus its efforts on mining garnet at the Sweetwater Garnet site, rather than on mining vermiculite at Dillon.

## F.  Financial Accounting Standard No. 121

35.  Financial Accounting Standard No. 121 (FAS 121) is applicable to the financial reports at issue in this case.

36.  FAS 121 recognizes that long-lived assets, such as Stansbury's mining claims, generally are recorded at cost, which usually is fair value on the date of acquisition.  Stansbury recorded the Hamilton and Dillon properties at cost, and specifically noted this fact in its SEC filings.  When the value of an asset has been determined to be impaired, FAS 121 requires the recognition of an impairment loss on that asset under certain conditions.

37.  FAS 121 requires a three step process to determine if an impairment loss must be recognized on a long-lived asset.  The first step is the identification of a triggering event. The second step is the development of projected cash flows for the asset to determine whether the sum of projected cash flows, un-discounted and without interest, is more or less than the carrying value of the asset.  The third step requires that the carrying value of the asset be written down if the sum of projected cash flows is less than the carrying value of the asset.  In that circumstance, the asset must be written down to its fair value.

38.  Under FAS 121, if the sum of projected cash flows is not less than the carrying value of the asset, then an impairment loss shall not be recognized.

39.  Triggering events under FAS 121 include a significant decrease in the market value of the asset, a significant change in the extent or manner in which the asset is used, a significant adverse change in legal factors or in the business climate that could affect the value of an asset, or an adverse action or assessment by a regulator.

40.  A default notice on a debt secured by a long-lived asset is, in many circumstances, a triggering event because such a notice indicates that the asset could be lost if the default is not cured.  In this circumstance, FAS 121 requires an analysis of whether or not the default can be cured.

41.  The default notices concerning Stansbury's debts secured by the Hamilton and Dillon properties were triggering events that required, at minimum, an analysis of whether or not the defaults could be cured by Stansbury.

42.  At the time of the Hamilton and Dillon default notices, Stansbury management believed that Stansbury could find a way to cure the defaults.

43.  A foreclosure action based on a debt secured by a long-lived asset is, in many circumstances, a triggering event because a foreclosure indicates that the asset could be lost if the foreclosure cannot be stopped by bringing the debt current or through other means. In this circumstance, FAS 121 requires an analysis of whether or not the foreclosure can be stopped before it is completed. The foreclosure actions concerning Stansbury's debts secured by the Hamilton and Dillon properties were triggering events that required, at minimum, an analysis of whether or not Stansbury could stop the foreclosure actions before they were completed.

44.  The Montana Department of Environmental Quality's limitation of the permit

10

for the Dillon property to a five acre small miner's exclusion was a triggering event under FAS 121.  This was an adverse action by a regulator that could have affected the value of the Dillon property and the cash flow from mining on the Dillon property.

45.  Stansbury's decision to suspend efforts to mine the Hamilton property, and, instead, to concentrate on mining at Dillon, was a triggering event as to Hamilton under FAS 121.

46.  Stansbury's decision to suspend vermiculite mining at Dillon, and, instead, to concentrate on garnet mining at Sweetwater, was a triggering event as to Dillon under FAS 121.

47.  The SEC's expert witness, Richard Graff, CPA, testified that each of the triggering events described above triggered a requirement that Stansbury estimate future cash flows from the affected asset, and then determine wether those future cash flows were less than the carrying amount of the asset.

48.  Graff testified that he did not conduct cash flow analyses as to either the Hamilton property or the Dillon property based on the triggering events he identified. Graff testified that he did not have the expertise needed to conduct a proper cash flow analysis of mining assets such as Hamilton or Dillon, and that a proper cash flow analysis could be conducted only by someone with expertise in mining of mineral assets.

49.  FAS 121 does not explicitly require that an expert conduct such an analysis.

50.  Graff testified that he conducted an analysis of triggering events relevant to the Hamilton and Dillon properties, the first step of a FAS 121 analysis.  Graff testified further that, for the purpose of his analysis, no one performed step two or step three of

the FAS 121 analysis as to either the Hamilton property or the Dillon property.  Graff

testified that neither he nor the SEC retained a person with the expertise necessary to

conduct a cash flow analysis of the Hamilton or Dillon properties, based on the

triggering events specified by Graff.  Graff testified that he did not know what such

analyses would have projected.

51.  Graff opined that, based on the information available to him, proper cash

flow analyses of the Hamilton and Dillon properties would have resulted in cash flow

projections for the properties that would have been low enough to require an

impairment of the Hamilton and Dillon properties under FAS 121. Graff's opinion about

the probable results of cash flow analyses of the Hamilton and Dillon properties is not

based on the type of cash flow analysis that Graff opines is required by FAS 121.

Rather, Graff's opinion about the probable results of proper cash flow analyses is

based on incomplete data and an analysis that Graff concedes did not comply fully with

the requirements of FAS 121.

52.  FAS 121 provides that estimates of future cash flows

shall be the best estimate based on reasonable and supportable
assumptions and projections.  All available evidence should be
considered in developing estimates of expected future cash flows.  The
weight given to the evidence should be commensurate with the extent to
which the evidence can be verified objectively.

Exhibit 143, FAS 121, ¶ 9.

53.  Stansbury and its accountants conducted some cash flow analyses of the

Hamilton and Dillon properties near the time of the triggering events, and those cash

flow analyses predicted cash flows from the properties that exceeded the carrying value

of the properties.

54.   Stansbury's auditors, including Sellers, reviewed these cash flow analyses and gathered other information to corroborate Stansbury's stated assessments of its mining properties and business.

55.   Graff testified that he reviewed these cash flow analyses, but he found them to be inadequate because the analyses often did not cite the source of certain information on which the analysis relied, and the projections did not indicate whether certain factors that Graff considers to be important were considered in the analyses. The fact that a source of information is not cited may mean that there is a source, but it was not cited, or that there is no source.  Similarly, the fact that certain factors are not noted on an analysis may mean that the factor was considered, but was not noted, or that the factor simply was not considered.  Graff's opinion about the flaws in Stansbury's written analyses does not, by itself, demonstrate that the analyses were not based on information from reliable sources, or that they did not consider certain relevant factors.

56.   Aside from Graff's unsupported opinion about the probable result of proper cash flow analyses, there is no evidence in the record of this case that a proper cash flow analysis of either the Hamilton or Dillon properties, conducted near the time of any triggering event specified by Graff, would have resulted in a projected cash flow from either property that was lower than its carrying value as reported on Stansbury's books and in its public reporting.

57.   Graff's criticisms of the cash flow analyses completed by Stansbury may be entitled to some weight, but the flaws cited by Graff do not indicate ineluctably that correction of the flaws would have led to a cash flow analysis that would have required

an impairment of either Hamilton or Dillon under FAS 121.  Again, nothing in the record demonstrates how a cash flow analysis conducted under FAS 121 standards cited by Graff would have led to a result materially different than the cash flow analyses used by Stansbury.

58.  In January, 2003, Coffman wrote a memorandum to the directors of Stansbury discussing, *inter alia*, the valuations of the Hamilton and Dillon properties. Exhibit 94.  In this memorandum, Coffman outlines several negative factors relating to each property.  Many, but not all, of these factors were known to Coffman during the time period relevant to this case.  The circumstances relevant to several of the factors specified by Coffman were changing or evolving over time.

59.  In the January 23, 2003, memorandum, Coffman suggested that the Dillon property be written down on Stansbury's books from its cost to a salvage value.  He suggested also that the Hamilton property be written down to the amount of debt against the property.  He suggested that these write downs be effective as of June 30, 2002.

60.  Coffman's January 23, 2003, memorandum is, in part, a hindsight analysis of constellations of developing factors that affected the Hamilton and Dillon properties. Many of the events discussed in the memorandum are events that Graff identified as triggering events under FAS 121.  The conclusions in Coffman's January 23, 2003, memorandum are based on Coffman's retrospective analysis of the confluence of various developing events that affected Hamilton and Dillon in mid-2002.  The constellation of events relevant to each property was, in some significant ways, different when the memo was written than when the triggering events identified by Graff

14

occurred.

61.  Coffman's January 23, 2003, memorandum does not include the type of cash flow analysis that Graff testified was required properly to apply FAS 121 after the occurrence of the various triggering events identified by Graff.

### G.  Richard Sellers & Sellers and Associates

62.  In the spring of 1998, Stansbury engaged Richard E. Sellers and Sellers & Associates, P.C. (collectively "Sellers") to perform an audit of the Company's financial statements for the fiscal years 1997 and 1998.  Stansbury's fiscal year ended on June 30 of each year.  Seller's field work for the 1997 and 1998 audits began in the spring or summer of 1998.  Sellers issued an opinion on the financial statements of Stansbury for the fiscal years ending June 30, 1997, and June 30, 1998.  Exhibit 46.

63.  As part of his initial audit, Sellers determined that Stansbury had carried the Hamilton property on its balance sheet at market value of $34,577,270 since 1985 and that other accounting firms had approved this valuation.

64.  As part of his audit, Sellers visited the Hamilton property with Dr. James Hindman in May of 1998.  Dr. Hindman was known to have substantial knowledge and expertise concerning vermiculite.  Dr. Hindman explained to Sellers where the Hamilton properties were located and gave him a tour of the properties.  Dr. Hindman also explained how vermiculite is mined and how it is used in industry.

65.  Dr. Hindman explained that he had recently established the market value of the Hamilton deposit at $51,000,000 and that it would be practical to recover 50,000 tons of vermiculite per year over a twenty-five year life span from the Hamilton property.  Exhibit 49.

66.  Sellers made reasonable efforts to audit Stansbury's statement that it held title to the claims. Sellers visited the local office of the Forest Service to review claim filings and obtained a copy of the relevant EIS directly from the Forest Service.  Exhibit 47.  Sellers found no evidence to indicate that Stansbury's statement of ownership was incorrect.

67.  Ultimately, Sellers concluded that the Hamilton property should not be carried at market value but rather at the cost of the property, which value was a lower figure.  This change in the valuation of the Hamilton property was reflected and explained in Stansbury's 10-K for the period ending June 30, 1999, and in Seller's opinion on the financial statements of Stansbury for the fiscal years ending June 30, 1997, and June 30, 1998.  Exhibits 45, 46.

68.  Sellers issued an opinion with a "going concern limitation" for the fiscal year ended June 30, 1999, stating that it was questionable whether or not Stansbury can remain a going concern.  Exhibit  46.  This going concern statement outlines bluntly Stansbury's bleak record of business failure, and the long list of problems it faced.  This going concern limitation notes that the financial statement did not contain any adjustment relating to the recoverability of the assets if Stansbury should be unable to continue as a going concern.  A similar going concern limitation was included in each of Stansbury's 10-Ks and 10-Qs for the entire period at issue in this case.  Exhibits 34 - 45.

69.  Sellers was replaced as Stansbury's auditor for fiscal years 1999 and 2000. Sellers was succeeded by Haugen Springer & Co., P.C. ("Haugen & Springer") of Denver, Colorado.  The 1999 and 2000 financial statements audited by Haugen &

Springer continued to report and carry the Hamilton property at cost on Stansbury's balance sheet.  Stansbury conducted an impairment analysis in these years and determined that no impairment was necessary.  Haugen & Springer audited the analysis and, in its judgment, the analysis seemed reasonable.

70.  Sellers was hired to perform the audit for fiscal year 2001.  Sellers made site visits to the new properties that Stansbury had acquired since Sellers' previous audit, the Dillon property and the Sweetwater garnet property.  Sellers cross checked the ownership of the claims for the new properties with the Bureau of Land Management in Dillon, Montana.

71.  After conducting his site visits and other field work, Sellers came to Denver to review the work papers of Haugen & Springer and Stansbury's records related to the audit.  This review included a review of cash flow projections on Hamilton and Dillon.  Haugen & Springer and Stansbury both had prepared cash flow projections on Hamilton and Dillon at certain times.  Sellers reviewed these cash flow projections, and he believed them to be reasonable at the time.

72.  The cash flow projections indicated that the anticipated cash flows would exceed the carrying value of the Hamilton and Dillon properties.  Sellers discussed these calculations with Coffman and compared them to the valuation opinions written by Dr. Hindman and the general trend of prices of vermiculite.  Sellers' judgment was that Stansbury's estimate of the future cash flows was reasonable and that Stansbury's judgment that the mining properties were not impaired was reasonable.  Exhibit 5.

73.  During the last two weeks of field work, Sellers met both with the president of the company, A.J. Coffman, the former auditor, Charles Springer, and with Sellers'

concurring reviewer, Larry O'Donnell, a Denver CPA.  Mr. O'Donnell had experience auditing public companies and was a member of the AICPA SEC public companies section.  As a concurring reviewer, O'Donnell reviewed the work of Sellers.

74.  O'Donnell reviewed Sellers' work papers and also discussed the issue of the carrying value of the properties with Sellers.  O'Donnell did not believe that any changes needed to be made to the carrying value of the mining properties.

75.  Sellers reviewed Stansbury's quarterly reports for the periods ending September 30, 2001, December 30, 2001 and March 31, 2002, which were submitted to the SEC on Form 10-Q.  Stansbury did not make any adjustments on these quarterly financial statements to the carrying value of the Hamilton or Dillon properties.

## III.  CONCLUSIONS OF LAW

### A.  Claims

1.  The SEC bears the burden of proof on each element of each of its claims, and must prove each element by a preponderance of the evidence.  The SEC asserts nine claims against the defendants:

**1. Violations by Coffman of Section 17(a)(1) of the Securities Act of 1933** [15 U.S.C. § 77q(a)].  The elements of this claim are

a. Coffman directly or indirectly used a device, scheme or artifice to defraud

b. with scienter;

c. in an offer or sale of securities;

d. using interstate commerce or the mails.

**2. Violations by Coffman of Sections 17(a)(2) and 17(a)(3) of the Securities Act** [15 U.S.C. § 77q(a)(2) and 77q(a)(3)].  The elements of

this claim are

a.  Acting negligently[3];

b. Coffman directly or indirectly:

> (1) made an untrue statement of material fact; OR

> (2) omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; OR

> (3) engaged in transactions, practices, or courses of business which operated as a fraud or deceit;

c. obtained money;

d. in an offer or sale of securities;

e. using interstate commerce or the mails.

**3. Violations by Coffman of Section 10(b) of the Securities Exchange**

**Act of 1934** [15 U.S.C. § 78j(b)] and Rule 10b5 thereunder [17 C.F.R.

§ 240.10b5].  The elements of this claim are

a. Coffman directly or indirectly:

> (1) employed a device, scheme or artifice to defraud; OR

> (2) made an untrue statement of material fact; OR

> (3) omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; OR

> (4) engaged in transactions, practices, or courses of business which operated as a fraud or deceit;

---

[3]  Coffman argues that a negligence standard is applicable to claims under § 17(a)(2) and (a)(3). I agree. *See, e.g.,* **S.E.C. v. Merchant Capital, LLC**, 483 F.3d 747, 766 (11th Cir.2007); **Weiss v. S.E.C.**, 468 F.3d 849, 855 (D.C. Cir. 2006).

b. with scienter;

c. in the purchase or sale of securities;

d. using interstate commerce or the mails.

**4. Violations by Coffman of Rule 13b21of the Exchange Act** [17 C.F.R.

§ 240.13b21].  The element of this claim is that Coffman directly or indirectly falsified or caused to be falsified books, records or accounts subject to Section 13(b)(2)(A) of the Exchange Act.

**5. Violations by Coffman of Section 13(b)(5) of the Exchange Act** [15

U.S.C. § 78m(b)(5)].  The elements of this claim is that Coffman knowingly circumvented or knowingly failed to implement a system of internal accounting controls and knowingly falsified books, records, or accounts described in Section 13(b)(2) of the Exchange Act.

**6. Aiding and abetting by Coffman of Stansbury's violations of**

**Section 13(b)(2)(A) of the Exchange Act**.[4]  The elements of this claim

are

a. Stansbury failed to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected the company's transactions and dispositions of its assets;

b. Coffman knew that Stansbury failed to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected the company's transactions and dispositions of its assets;

c. Coffman substantially assisted Stansbury's failure to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected the company's transactions and dispositions of its assets.

**7. Aiding and abetting by Coffman of Stansbury's violations of**

---

[4]  Coffman and Sellers argue that an aiding and abetting claim, as defined by § 20(e) of the Exchange Act, 15 U.S.C. § 78t(e), requires proof of actual knowledge by the alleged violator.  I agree, and I adopt the analysis of the court in *S.E.C. v. KPMG LLP*,  412 F.Supp.2d 349, 382-384 (S.D.N.Y. 2006), concerning this issue.  However, even if the SEC is correct that recklessness also is sufficient to establish an aiding and abetting claim under § 20(e), I conclude that the SEC has not proven each element of its aiding and abetting claims by a preponderance of the evidence.

**Section 13(b)(2)(B) of the Exchange Act**. The elements of this claim are

a. Stansbury failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions were recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and to maintain accountability for assets; and the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences;

b. Coffman knew that Stansbury failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions were recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and to maintain accountability for assets; and the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences;

c. Coffman substantially assisted Stansbury's failure to devise and maintain a system of sufficient internal accounting controls.

**8. Aiding and abetting by Coffman, Sellers and Sellers & Associates**

**of Stansbury's violations of Section 13(a) of the Exchange Act and**

**Rules 12b20, 13a1, and 13a13**.[5]  The elements of this claim are

a. Stansbury was subject to the periodic reporting requirements imposed by the Securities Exchange Act on companies having securities registered with the Commission;

b. The periodic filings made by Stansbury during the relevant period were materially inaccurate;

c. Stansbury also failed to add material information that was necessary to make the required statements or reports, in light of the circumstances under which they were made, not misleading;

d. Coffman knew that Stansbury filed materially inaccurate and misleading annual and quarterly reports with the Commission, failed to add material

---

[5]  At trial I dismissed this claim to the extent it was based on an allegation that Coffman aided and abetted a failure by Stansbury to file required reports with the SEC.

information that was necessary to make the required statements or reports, in light of the circumstances under which they were made, not misleading;

e. Coffman substantially assisted Stansbury in committing these violations;

f. Sellers and/or Sellers & Associates knew that Stansbury filed materially inaccurate and misleading annual and quarterly reports with the Commission and failed to add material information that was necessary to make the required statements or reports, in light of the circumstances under which they were made, not misleading;

g. Sellers and/or Sellers & Associates substantially assisted Stansbury in committing these violations.

**9. Aiding and abetting by Sellers and Sellers & Associates of**

**Stansbury's violations of Section 10(b) of the Exchange Act and Rule**

**10b5.**  The elements of this claim are

a. Stansbury directly or indirectly:

> (1) employed a device, scheme or artifice to defraud; OR

> (2) made an untrue statement of material fact; OR

> (3) omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; OR

> (4) engaged in transactions, practices, or courses of business which operated as a fraud or deceit;

b. with scienter;

c. in an offer or sale of securities ;

d. using interstate commerce or the mails;

e. Sellers and/or Sellers & Associates substantially assisted Stansbury's violation;

f. Sellers and/or Sellers & Associates had the necessary scienter.

## B.  Materiality - Claims One, Two, Three, Eight, & Nine

2.  The SEC's claims based on § 17 of the Securities Act and § 10(b) of the Exchange Act require proof that the misstated or omitted information was material. Although Section 17(a)(1) does not contain the word "material," proof of a material misrepresentation or a materially misleading omission is required to establish a violation of § 17(a)(1).  *See, e.g.,* **SEC v. Merchang Capital, LLC**, 483 F.3d 747, 766 (11th Cir. 2007).  Similarly, the SEC's claim based on § 13(a) of the Exchange Act, and rules promulgated thereunder, requires proof of a material misrepresentation or a materially misleading omission.  Claims one, two, three, eight, and nine require proof of a material misrepresentation or a materially misleading omission.  Absent adequate proof of materiality, each of these claims must fail.

3.  A misstatement or omission is material if there is a substantial likelihood that a reasonable investor would consider the information to be important in making an investment decision.  **Basic Inc. v. Levinson**,  485 U.S. 224, 231-232 (1988).  Stated in terms of an omission to state a fact, a fact is material if there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.  **Id**.

4.  I find and conclude that the SEC has not proven that Stansbury materially overstated the values of the Hamilton and Dillon properties in its financial reporting to the SEC between June 30, 1999 and March 31, 2002.

5.  The SEC's claim that Stansbury materially overstated the values of the Hamilton and Dillon properties is based primarily on the SEC's argument that

23

Stansbury failed to report those values in compliance with the requirements of FAS 121, which requires the recognition of an impairment loss on a long-lived asset if the sum of estimated future cash flows is less than the carrying value of the asset as reflected on the books of the company.  The SEC did not present any evidence that demonstrated how future cash flows for the Hamilton and Dillon properties should have been calculated properly under FAS 121.  Absent such evidence, it is not possible to conclude that such future cash flow projections for the Hamilton and Dillon properties would have resulted in a sum of projected cash flows that was less than the carrying value of the Hamilton and Dillon properties.

6.  Graff's opinion that proper cash flow analyses of the Hamilton and Dillon properties would have resulted in cash flow projections for the properties that would have been low enough to require an impairment of the Hamilton and Dillon properties under FAS 121 is not admissible under Fed. R. Evid. 702.  Graff testified that he did not have the expertise to conduct a cash flow analysis of these mining assets, and it is apparent that Graff did not gather sufficient data to conduct such analyses.  Even if Graff's opinion about the likely result of proper cash flow analyses is admissible, I conclude that this opinion is entitled to no weight because it is based on incomplete data and incomplete analysis.

7.  Stansbury conducted some cash flow analyses of the Hamilton and Dillon properties near the time of the triggering events, and those cash flow analyses predicted cash flows from the properties that exceeded the carrying value of the properties.  Stansbury's auditors, including Sellers, reviewed these analyses and concluded that they were reasonable.  There is no evidence in the record that

demonstrates that these cash flow analyses were completed in a fashion that deviated significantly from the requirements of step two of FAS 121.

8.  When, as here, there is no evidence demonstrating the magnitude of an alleged financial misrepresentation, I cannot conclude that a material misrepresentation was made.  Absent evidence in support of the SEC's assertion that the proper valuation of the Hamilton and Dillon properties was substantially lower than the valuations reported by Stansbury, I cannot conclude that the valuations reported by Stansbury were overstated materially.

9.  Additionally, the SEC has not shown any material misrepresentations with respect to its claim that Stansbury failed to disclose a possible loss of its mining properties.   To the extent that the SEC's theory is that there was some quantifiable financial loss associated with pending foreclosure proceedings against the Hamilton and Dillon properties, the SEC failed to provide any evidence of an amount of loss, or a range of amounts of loss, that would have been required under GAAP.  Thus, for the same reasons that the SEC did not prove a material misrepresentation with respect to the value of Stansbury's mining properties, it did not prove a financial misrepresentation with respect to a possible loss associated with those properties.

10.  To the extent that the SEC does not claim that there was some amount of loss that should have been determined and reflected in the financial statements, but that there should have been some narrative disclosure of the possibility of loss of the properties, its case fares no better.  Stansbury made consistent disclosures of its defaults on obligations secured by its mining property assets, the existence of numerous judgments against it, and the foreclosure proceedings against the Hamilton

and Dillon properties.  Exhibits 34 to 46.  These disclosures were sufficient to inform the public that Stansbury could lose the Hamilton and Dillon properties because of the defaults and foreclosures tied to those properties.  No particular form of language is required for the expression of material facts, so long as the disclosure meets the standard of fair accuracy.

11.  Because of the absence of sufficient proof of a material misrepresentation by Stansbury, claims one, two, three, eight, and nine must be dismissed.

### C.  Scienter - Claims One, Three, & Nine

12.  Similarly, the SEC has failed to prove by a preponderance of the evidence that Coffman or Sellers acted with scienter.  Scienter is a state of mind embracing an intent to deceive, manipulate, or defraud. *City of Philadelphia v. Fleming Companies, Inc*., 264 F.3d 1245, 1258 (10th Cir. 2001).  Recklessness can satisfy the scienter element. In this context, recklessness is defined as conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading investors that is either known to the defendant or is so obvious that the defendant must have been aware of it. *Id*. at 1260.

13.  The SEC has not presented evidence that proves by a preponderance of the evidence that Coffman or Sellers acted with scienter.  Coffman did not sell any Stansbury stock in order to profit from the fraud alleged by the SEC.  Coffman was paid a salary by Stansbury, and personal profit can be considered to be evidence indicative of scienter.  Here, I give Coffman's profit, via his salary, very little weight in analyzing the scienter issue.  It is notable that Stansbury was unable to pay Coffman's salary for at least 21 months before his resignation as an officer and director of Stansbury at the

end of 2002.  Coffman Testimony, 5-9-06, p. 6, l. 6 - p. 7, l. 6.

14.  Sellers was paid a fee for his auditing services, but in the end he was not paid his full fee.  Sellers did not sell any Stansbury stock in order to profit from the fraud alleged by the SEC.  As with Coffman, I give Sellers' profit from Stansbury very little weight in evaluating whether he acted with scienter.

15.  The fact that Coffman and Sellers recommended in 1998 that the Hamilton property be restated and reduced in value on Stansbury's books is some indication that Coffman and Sellers acted honestly with regard to Stansbury's financial reporting.  However, the 1998 recommendation is removed in time from the key events at issue in this case, and I give this fact little weight in the scienter analysis.

16.  Even if the SEC had shown that Stansbury had reported financial results contrary to GAAP, such a showing, by itself, is not sufficient to prove that Coffman or Sellers acted with scienter.  ***Adams v. Kinder-Morgan, Inc.***, 340 F.3d 1083, 1105 (10th Cir. 2003) (applying PSLRA).  It must be noted too that Coffman is not an accountant and has not been shown to have received training in accounting.  In this context any GAAP violation carries even less weight in the scienter calculus.  There is no evidence that anyone suggested to Coffman that Stansbury's assets were impaired.  To the contrary, the evidence showed that both Stansbury's internal accountants concluded that no impairment had occurred, and both sets of Stansbury's outside auditors agreed that those conclusions were reasonable.  There is no evidence to indicate that Coffman knew these accountants were wrong if, in fact, they were wrong.  Sellers is an accountant, but he had the concurrence of other accountants who had reviewed the impairment issue surrounding the Hamilton and Dillon properties.  There is little or no

evidence that Sellers knew or was reckless in not knowing that the failure to restate and reduce the value of the properties on Stansbury's books violated FAS 121 or otherwise amounted to a misrepresentation.

17.   Finally, the evidence indicates that Coffman and Sellers made reasonable efforts to comply with the impairment analysis required by FAS 121.   The SEC claims this analysis was not applied correctly, but, again, there is no evidence to indicate how a purportedly correct FAS 121 analysis would have differed materially from that of Sellers and Coffman.   In this context Sellers' and Coffman's efforts to apply the FAS 121 analysis augurs against a finding of scienter.

18.   In the absence of proof that Coffman and Sellers acted with scienter in making material misrepresentations or omissions, or in aiding and abetting the same, claims one, three, and nine, as outlined above, must be dismissed.

### D.  Sections 13(b)(2)(A), 13(b)(2)(B), 13(b)(5), & Rule 13b2-1 Claims Four, Five, Six, & Seven

19.   Section 13(b)(2)(A) of the Exchange Act requires all reporting companies to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect their transactions and dispositions of their assets.   Section 13(b)(2)(B) of the Exchange Act requires issuers with securities registered under the Exchange Act to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP.

20.   The Commission need not show scienter to prove a violation of Section 13(b)(2).

21.   The SEC did not establish by a preponderance of the evidence that

Stansbury's valuation of the Hamilton and Dillon properties was not in compliance with the requirements of FAS 121 and GAAP. Again, the SEC did not demonstrate that a proper cash flow analysis under FAS 121 would have resulted in a cash flow estimate that was lower than the carrying value of the Hamilton or Dillon properties, as reflected on Stansbury's books. Again, such proof is required to demonstrate that Stansbury's valuation of the Hamilton and Dillon properties was not in compliance with FAS 121 and GAAP.

22.   Absent proof of a violation of GAAP in this respect, I cannot conclude that Stansbury violated Section 13(b)(2)(A) by failing to record transactions accurately in conformity with GAAP.

23.   Similarly, the SEC has not demonstrated that Stansbury violated Section 13(b)(2)(B) because it failed to establish and maintain internal accounting controls sufficient to prevent the improper valuation of its mineral properties. Again, other than the claim that the Hamilton and Dillon properties were overvalued under the standards of FAS 121 because Stansbury and Sellers applied accounting procedures that did not comply with FAS 121, the SEC presented no evidence that Stansbury did not maintain a system of accounting controls to ensure compliance with GAAP. The evidence demonstrates that Stansbury did compare the valuations of Hamilton and Dillon with cash flow projections, as required by FAS 121, indicating that Stansbury undertook reasonable efforts to comply with GAAP.

24.   Absent proof of an underlying violation of § 13(b)(2)(A) by Stansbury, *a fortiori*, I cannot conclude that Coffman aided and abetted Stansbury's violations of Section 13(b)(2)(A).

25.   Absent proof of an underlying violation of § 13(b)(2)(B) by Stansbury, *a fortiori*, I cannot conclude that Coffman aided and abetted Stansbury's violations of Section 13(b)(2)(B).

26.   Similarly, the SEC has not proven by a preponderance of the evidence that Coffman directly violated § 13(b)(5) or Rule 13b2-1 by falsely recording Stansbury's assets, or failing to maintain adequate accounting controls.  Section 13(b)(5) is violated when a person knowingly circumvents or knowingly fails to implement a system of internal accounting controls and knowingly falsifies books, records, or accounts.  Rule 13b2-1 is violated when a person directly or indirectly falsifies or causes to be falsified books, records or accounts subject to § 13(b)(2)(A).[6]

27.   The SEC's theory that Coffman failed to maintain adequate accounting controls and falsified books, records, or accounts arises from its claim that Coffman failed to reduce the carrying value of the Hamilton and Dillon properties when proper accounting required that those assets be reduced in value.  As discussed above, the SEC failed to prove that a reduction in the value of the Hamilton and Dillon properties was required under the applicable accounting standards.  Absent such proof, I cannot conclude that Coffman failed to maintain adequate accounting controls or falsified or caused to be falsified Stansbury's books, records, or accounts, in violation of § 13(b)(5) and Rule 13b2-1.

28.   No other evidence in the record supports the conclusion that Coffman failed to maintain adequate accounting controls or that he falsified or caused to be falsified

---

[6]  Coffman notes that the SEC must prove that Coffman acted knowingly in order  to prove a violation of  § 13(b)(5).  He argues that the element of knowing action cannot be nullified by regulations promulgated under the statute, such as Rule 13b2-1, which does not include the word knowingly.  Given the evidence in this case, I need not resolve this issue.

Stansbury's books, records, or accounts.

29.  Given the absence of evidence to prove these essential elements of claims four, five, six, and seven, these claims must be dismissed.

### E.  Evidentiary Objections

30.  Coffman and Sellers objected at trial to the admission of certain items of evidence.  I received the evidence subject to Coffman and Sellers' objections.  I now overrule Coffman and Sellers' objections at trial.

31.  The parties stipulated to the admission of several transcripts of investigative testimony and deposition testimony by Coffman and Sellers, and by several other witnesses.

32.  Sellers filed a list of objections to certain items in the SEC's deposition designations.  Sellers' objections are overruled.

33.  The SEC also filed a list of objections to certain items in the defendants' deposition designations.  Those objections are resolved, as outlined in the following paragraph.

34.  Newton Deposition - p. 23:12 - 23:16 - sustained, Fed. R. Evid. 602; p. 27:11 - 27:20 - overruled - foundation adequate; p. 32:1 - 32:7 - overruled - not hearsay; Schnase Deposition - p. 32:11 - 32:25 - overruled - foundation adequate and evidence relevant under Fed. R. Evid. 401; Sellers Deposition - p. 34:17 - 34:22 - overruled - not offered for the truth of the statement, but to show what Seller's believed; Springer Deposition - p.32:4 - 32:14 - overruled - foundation adequate; Staal Deposition - p. 65:25 - 65:25 - overruled - line addressed is counsel's statement of an objection; p. 72:12 - 73:9 - overruled - foundation adequate; Wertz Deposition - p.

70:18 - 71:2 - sustained, Fed. R. Evid. 801, 802; p. 87:18 - 88:5 - sustained, Fed. R.

Evid. 901; p. 92:5 - 92:12 and 92:21 - 93:2 - overruled - statement not offered for the

truth of the matter asserted; Yuengling Deposition - p. 57:12 - 57:13 - overruled -

answer follows two questions from counsel; p. 70:20 - 72:23 - sustained.

### F.  Conclusion & Orders

35.  Having reviewed the evidence in the record, I find and conclude that the

SEC has failed to prove by a preponderance of the evidence one or more elements of

each of its nine claims.  Therefore, these claims must be dismissed.

36.  The parties disagree about the precise elements of claim two, a claim based

on § 17(a)(2) and (a)(3) of the Securities Act, and the elements of the aiding and

abetting claims, claims six through nine.  I find and conclude that even if the elements

of these claims were stated and analyzed as argued by the SEC, my analysis would be

the same, and the result would be the same.

37.  To the extent that any objection or other argument asserted by the parties is

not specifically addressed in this opinion, I have considered but rejected all such

matters.

**THEREFORE, IT IS ORDERED** as follows:

1. That **JUDGMENT SHALL ENTER** under FED. R. CIV. P. 58 in favor of

defendant, Aldine J. Coffman, and against the plaintiff, Securities and Exchange

Commission, on claims one, two, three, four, five, six, seven, and eight, as outlined in

the Final Pretrial Order [#80], filed April 23, 2007;

2.  That **JUDGMENT SHALL ENTER** under FED. R. CIV. P. 58 in favor of

defendants, Richard E. Sellers and Sellers & Associates P.C., and against the plaintiff,

Securities and Exchange Commission, on claims eight and nine, as outlined in the Final Pretrial Order [#80], filed April 23, 2007;

     3.  That under FED. R. CIV. P. 54(d)(1) and 28 U.S.C. § 2412(a)(1), defendants Coffman, Sellers, and Sellers & Associates are **AWARDED** their costs, which shall be requested and taxed pursuant to FED. R. CIV. P. 54(d)(1) and  D.C.COLO.LCivR 54.1; and

     4.  That this case is **DISMISSED** with prejudice.

Dated August 21, 2007, at Denver, Colorado.

                           **BY THE COURT**

                           **s/ Robert E. Blackburn**
                           **Robert E. Blackburn**
                           **United States District Judge**